# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

WILLIE RABB,                          :

      Plaintiff,              :

vs.                                   :          CA 09-0420-C

GEORGIA PACIFIC, LLC, etc., et al,    :

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the undersigned on the defendants' motion for summary

judgment (Doc. 25; *see also* Docs. 26-27), plaintiff's response in opposition (Doc. 29), the

defendants' motion to strike (Doc. 30; *see also* Doc. 31 (memorandum of law in support

of motion to strike); Doc. 32 (declaration of Sabrina Rockoff)), and the defendants' reply

brief (Doc. 33). The defendants' motion for summary judgment is before the Court for

disposition, pursuant to 28 U.S.C. § 636(c), on the implicit consent of the parties.

*Compare Roell v. Withrow,* 538 U.S. 580, 590, 123 S.Ct. 1696, 1703, 155 L.Ed.2d 775

(2003) ("We think the better rule is to accept implied consent where, as here, the litigant

or counsel was made aware of the need for consent and the right to refuse it, and still

voluntarily appeared to try the case before the Magistrate Judge. Inferring consent in

these circumstances thus checks the risk of gamesmanship by depriving parties of the

luxury of waiting for the outcome before denying the magistrate judge's authority. Judicial efficiency is served; the Article III right is substantially honored.") *with* Doc. 2, at 1 ("This civil action has been randomly assigned to United States Magistrate Judge William E. Cassady for all purposes including trial. In accordance with 28 U.S.C. § 636(c), the Magistrate Judges of this District Court have been designated to conduct any and all proceedings in a civil case, including a jury or non-jury trial, and to order the entry of a final judgment, upon the consent of all parties. . . . You have the right to have your case reassigned to a United States District Judge for trial and disposition. If you wish to have the case reassigned, you or your attorney need only return the Request for Reassignment to a United States District Judge (attached) by email to Edwina_Crawford@alsd.uscourts.gov.") *and* Doc. 15, at ¶ 8 ("This consent action shall be pretried by Magistrate Judge William E. Cassady on **July 15, 2010 at 2:00 p.m. in Mobile, Alabama**."). Upon consideration of the foregoing pleadings, and all other relevant pleadings in the file, the Court **GRANTS** the defendants' motion for summary judgment (Doc. 25)[1] in its entirety and **DISMISSES** plaintiff's complaint (Doc. 1), as amended (Doc. 22), **WITH PREJUDICE**.[2]

---

[1]     Any appeal taken from this memorandum opinion and order and judgment must be made to the Eleventh Circuit Court of Appeals. (*See* Doc. 2, at 1 ("An appeal from a judgment entered by a Magistrate Judge may be taken directly to the United States Court of Appeals for the Eleventh Circuit in the same manner as an appeal from any other judgment of a district court."))

[2]     It is clear to this Court, plaintiff making no argument to the contrary, that defendant

# FINDINGS OF FACT

1.    Willie Rabb began his employment with Smurfit-Stone Container Enterprises, Inc.'s paper mill in Brewton, Alabama in February of 1993. (Doc. 26, Exhibit B, Deposition of Willie Rabb, Jr., at 41-42) Rabb was initially hired to work on a paper machine (*id*. at 42); by 1998 or 1999, however, Rabb was working in the mill's laboratory (*id*. at 44). Plaintiff became an environmental shift lab technician in 2004 or 2005. (*Id*. at 48) This job required him to collect and test samples of wastewater from various ponds around the mill (that is, API, IPW, Ox pond, etc.) to determine biological oxygen demands ("BODs")[3] and chemical oxygen demands ("CODs"). (*Id*. at 49;[4] *see also id*. at

---

Georgia-Pacific LLC never employed Rabb and took no action against him; therefore, this defendant is not a proper party to this action and, for this additional reason, all claims against it are **DISMISSED WITH PREJUDICE**. *See Hegre v. Alberto-Culver, USA, Inc.*, 508 F.Supp.2d 1320, 1333 & 1334 (S.D. Ga. 2007) ("In assessing whether corporate entities have interrelated operations, courts consider whether the businesses have 'combined accounting records, bank accounts, lines of credit, payroll preparation, switchboard, telephone numbers or offices.' There is no evidence of such interrelation in this case. . . . Plaintiff has not presented evidence from which a reasonable juror could conclude that any entity other than BSG may be considered her employer. There is simply no indication that Alberto-Culver Company, AC, or SBC had anything to do with the terms and conditions of Plaintiff's employment or her termination. Consequently, the Court lacks jurisdiction over these entities. Accordingly, Defendants SBC and AC are **DISMISSED** and Plaintiff's motion to amend her complaint to add Alberto-Culver Company as a defendant . . . is **DENIED** as both untimely and futile." (internal citations omitted)), *judgment aff'd,* 275 Fed.Appx. 873 (11th Cir. 2008).

[3]    In or around May of 2008, almost a year after Georgia-Pacific acquired from Smurfit-Stone certain assets of the Brewton paper mill, the BOD testing for wastewater collected from the compliance (or final discharge) points, that is, Ox Pond and Brewton Lake, was outsourced. (*See id.* at 76-77) Lab technicians at the mill continued to run the BOD tests on wastewater collected from noncompliance points and the mill sometimes made changes based upon the results of those tests. (*See id.* at 80-81) It is clear that BOD tests were not run on the

59 (in addition to CODs and BODs, plaintiff performed kappa tests, reduction tests, and viscosity tests))

2. In August of 2007, Georgia-Pacific Brewton, LLC acquired from Smurfit certain assets of the Brewton paper mill. (Doc. 26, Exhibit A, Declaration of Mike Wade, at ¶ 4) As a term of this acquisition, Smurfit terminated all mill employees. (*Compare id.* at ¶ 5 *with* Doc. 26, Exhibit B, Rabb depo., at 51) Georgia-Pacific Brewton, LLC[5] then accepted applications from any terminated employees, and others, who desired to file an application and hired individuals to staff the paper mill. (*See* Doc. 26, Wade declar., at ¶ 5; Rabb depo., at 51-52) Rabb was hired by Georgia-Pacific Brewton, LLC as a shift lab tech (Doc. 26, Wade declar., at ¶ 9) and his employment with Georgia-Pacific began in September of 2007 (Doc. 26, Rabb depo., at 56).[6]

3. In addition to terminating all employees of Smurfit, Georgia-Pacific "did

---

water samples until nutrient water was added and the samples were incubated for five days. (*See id.* at 97-99)

[4]    As explained by Rabb, the testing for CODs was not required when he worked for Smurfit but was required after Georgia-Pacific acquired the Brewton mill. (*See id.*) Rabb testified that he reported any high COD numbers to Jack Kirkland or Roberto Flores. (*See id.* at 95)

[5]    It is clear that Georgia-Pacific, LLC never employed any workers at the Brewton paper mill. (Doc. 26, Wade declar., at ¶ 6)

[6]    Almost immediately after being hired by Georgia-Pacific, plaintiff was released from work under a physician's care for knee surgery; Rabb was out of work from October 4, 2007 to December 3, 2007. (*Id.* at 140)

not immediately recognize the unions that had represented Smurfit employees at the Mill[,]" including the United Steelworkers union that represented shift laboratory technicians like Rabb. (Doc. 33, Declaration of Mike Wade, ¶¶ 6&7) Instead, "[d]uring this initial period, GP instituted a job skills and wood-products industry credit system to address past contractual elements of seniority." (*Id*. at ¶ 7)

> After GP recognized the United Steelworkers, GP and the union actively bargained over seniority. The resulting collective bargaining agreement continued the industry credit system for vacation accrual. Additionally, GP and the United Steelworkers negotiated a mill service order that ranked employees for the purposes of job progression and job bidding within the Mill.

(*Id*. at ¶ 8)

4.  Rabb filed a discrimination charge with the EEOC on March 5, 2008. (Doc. 26, Rabb depo., at 121; *see also* Doc. 29, Exhibit H (charge of discrimination)[7]) Some of the allegations contained in that particular filing relate to conduct which occurred when Rabb was a Smurfit employee. (*See* Doc. 26, Rabb depo., at 125)[8] The allegations related to Georgia-Pacific contained in this filing were the following: (1) Roberto Flores "jumped" him in public about drinking sodas out of the refrigerator even though it was

---

[7]  Rabb explained that he was filing the EEOC charge "to show . . . continuing action in the Brewton Mill and a lot of it is Retaliation because I am the only one who [is] still employed at the Brewton Mill who has filed EEOC charges against the members of management." (Doc. 29, Exhibit H, Letter to Linda Poole, at 4))

[8]  Rabb filed a separate lawsuit against Smurfit. (*Id*. at 56)

common practice for everyone to do that (*see id*. at 136-138)[9];[10] (2) after he returned to work in early December of 2007, Flores made comments about plaintiff being gone so long just for knee surgery and when he learned that Rabb had also had a vasectomy, Roberto stated he did not consider that a reason to be off work (*see* Doc. 26, Rabb depo., at 142-143);[11] (3) in December of 2007, plaintiff touched Flores on the stomach and asked him what was going on prompting Flores to retrieve a copy of the company's code of conduct which he asked Rabb to read while informing Rabb that he could be taken to personnel for touching him (*see id*. at 144-145);[12] (4) Flores blamed plaintiff for breaking chairs in the lab (*id*. at 147-148; *see also id*. at 139) and even posted letters in the lab informing lab employees that too many chairs were being damaged and no more new chairs were going to be ordered (*see id*. at 148 & 152);[13] and (5) he was reported for

---

[9]     Although plaintiff testified that Roberto never "jumped" anyone else about the sodas, he admitted that he did not know whether Roberto spoke to others when he was not around. (*Id*. at 137)

[10]     According to Rabb, Flores also made several comments to him about his EEOC filings against Smurfit.   (Doc. 29, Exhibit H, Rabb's Letter to Linda Poole attached to his March 5, 2008 Charge of Discrimination; *see also* Doc. 29, Exhibit G, Rabb depo., at 132-133)

[11]     Rabb testified that he retained full benefits while he was out with his knee surgery and that, other than Flores' comments, he suffered no adverse action because of the time he took off for the surgery. (*See id*. at 143-144)

[12]     Rabb complained that Flores responded in this manner despite personally witnessing several people, on different occasions, poking and grabbing him. (*See id*. at 145-146)

[13]     Rabb admitted that he was not mentioned by name in the letter. (*Id*. at 148) After seeing the letter, Rabb called the president of the local NAACP, Anthony McKenzie, to complain about

leaving an unopened (and unmarked) container of hydrochloric acid in the lab's wet room despite the fact that Flores could have simply dumped the chemical in the sink[14] (*id*. at 154-159).[15]

---

[14] the harassment he was enduring. (*Id*. at 149) After complaining to McKenzie, Rabb spoke to Jack Kirkland about the "chair" situation and Kirkland told him he would handle things. (*Id*. at 151-152) A few minutes after speaking with Kirkland, Flores removed the letters he had posted in the lab. (*Id*. at 152) The day after the letters were removed, Flores walked up to Rabb and informed him that "from now on this is a business only relationship." (*Id*. at 152)

[14]     "On February 25, 2008, I was involved in counseling Mr. Rabb for leaving out an unmarked container of what was suspected to be sulfuric acid after he had used it in mixing chemicals. During the investigation of this incident, Mr. Rabb admitted to me that he left out the unlabeled container of acid after making up additional acid. Although Mr. Rabb received a verbal counseling for this, the near-miss report that was filed did not mention his name." (Doc. 26, Wade declar., at ¶ 11)

[15]     Rabb admitted that he never saw anyone employed by Georgia-Pacific dump chemicals down the sink (*id*. at 159) nor could he recall ever seeing instances where unlabeled acid was left out on the counter while he was employed by Georgia-Pacific (*id*. at 165). Plaintiff was counseled by Miles Ball and Dan Rowland about this incident. (*Id*. at 163) Rabb admitted that Rowland told him that a "near miss report" had to be filed but that he would not put Rabb's name in the report. (*Id*.)   The "near miss report," which was identified by Rabb during his deposition (*id*. at 164), is attached as Exhibit A to Mike Wade's declaration (Doc. 26, Exhibit A to Wade declar.), and contains the following description of the incident: "A container was discovered on the counter in the wet lab. This container is used to make up chemicals. This container contained approx 2000mL of clear liquid. The oncoming shift found container not knowing what it was. The liquid was suspected to be 8N Sulfuric acid." (*Id*.) The report, as aforesaid, did not mention Rabb's name but does find that the root cause of the incident was "[e]mployee not making time on shift to complete the makeup of a batch of chemicals and forgot the container on counter." (*Id*.)

According to Rabb during the meeting he had with Rowland, Ball and Dennis Shipp, the union rep, about the unlabeled container of acid (Doc. 29, Exhibit G, Rabb depo., at 211-212 & 216), he actually showed Rowland a picture on his cell phone of a trip hazard (*id*. at 212) and also pointed out that the technicians did not wear lab coats when using a chemical that called for the wearing of lab coats (*id*. at 213-214); however, all of these "saftey hazards" were ignored/overlooked by Rowland and others (*id*. at 214). During the Rowland meeting, Anthony

5.      On or about May 21, 2008, Rabb submitted a letter of revision to the EEOC. (*See* Doc. 26, Rabb depo., at 166-167) A significant portion of the information in the letter related to several incidents occurring at Smurfit, not Georgia-Pacific (*see id.* at 169-172); the letter, however, revealed what plaintiff believed were examples of retaliation and a hostile work environment (*id.* at 172). This second filing made the following allegations: (1) after an in-house investigation performed by Amy Steinman with respect to plaintiff's March, 2008 EEOC charge of discrimination,[16] Flores raised "hell" to Rabb about his CODs being off (*id.* at 172-176; *see also id.* at 223 (Rabb reiterates that Steinman investigated at least his first EEOC charge)) and complained about Rabb filing EEOC "charges" against him (*see id.* at 182-183)[17]; (2) Flores and Jack Kirkland had another employee, Rusty Cunningham, go behind Rabb's back and rerun or retest wastewater samples that he had already tested (*see id.* at 183 & 187; Doc. 29,

McKenzie, the local NAACP president, called and asked Rabb if he needed him to come out to the mill but apparently Rabb thought better of that after Rowland said no names would be placed in the near-miss report. (*See id.* at 214) After concluding the meeting with Rowland, Rabb went directly to Mike Wade's office and when plaintiff tried to show Wade a cell phone picture of a safety violation, Wade told him to stop taking pictures with his phone and he also told him to stop calling McKenzie while he was at work. (*Id.* at 215-217)

[16]      Georgia-Pacific had an EEOC hotline for employees. (*See id.* at 225) Rabb did not call this hotline at any time to complain about his treatment by Flores but did call right before his termination regarding the incident that led to his termination. (*See id.*)

[17]      It is clear that Flores' complaints about Rabb's CODs and his comments to plaintiff about the EEOC charges occurred on the same day and on several occasions that same day. (Doc. 29, Exhibit G, Rabb depo., at 174-183)

Exhibit G, Rabb depo., at 184-186 & 188-189;[18] *cf.* Doc. 26, Exhibit D, Declaration of Jack Kirkland, at ¶ 11 ("At some point, I recall asking another lab employee to run COD tests on Mr. Rabb's samples to confirm accuracy. Asking another employee to run the tests was a common way to check lab employee accuracy, particularly when an employee had shown he had difficulty performing a test properly."));[19] (3) on May 9, 2008, while dumping his COD values Rabb spilled some of the liquid on his arm and the spot on his arm turned white prompting Kirkland to comment, "don't let Michael Jackson see that[,]" (Doc. 29, Exhibit G, Rabb depo., at 191);[20] and (4) on May 15, 2008, his foreman, Miles Ball, handed him a paper to sign and stated he was being counseled about his absences from work including four unexcused absences on March 8-11 when plaintiff was out of work on account of his father's death (*see id.* at 195-197 & 202-209)[21]

      6.     According to Rabb, supervisory officials ignored or overlooked all of his

---

[18]    In fact, Rabb spoke to Cunningham who informed him that Kirkland and Flores were having him rerun the tests. (Doc. 29, Exhibit G, Rabb depo., at 187-188) This happened over the course of one week when plaintiff was working the dayshift. (*See id.* at 193-194)

[19]    Rabb did not know whether other people were rerunning tests behind the person on the day shift but stated that he was never asked to rerun a day shift test (Doc. 26, Rabb depo., at 190) and he had never heard of Cunningham rerunning tests behind the other shift techs all of whom were white (Doc. 29, Exhibit G, Rabb depo., at 253)

[20]    Rabb was not offended by Kirkland's comment. (*Id.* at 192-193)

[21]    Georgia-Pacific's policy was to pay for three days of funeral leave and Rabb, in fact, was paid for three of the four days he missed work because of his father's funeral. (*Id.* at 209) Rabb does not recall asking anyone why the three days of paid funeral leave were recorded as unexcused absences. (*Id.*)

complaints about his treatment at the hands of Roberto Flores. (*See id*. at 219 & 222; *id.* at 223 (Rabb's testimony that Mike Wade's sole focus was on plaintiff's conduct in leaving the acid out unlabeled as opposed to any conduct by Flores))[22] Rabb testified that other than the fact that he was the only black man working in the lab and Flores did not treat anyone else like he treated Rabb, he has no other evidence that Flores' conduct was motivated by race. (*Id*. at 222)

7.      Jeff Joyce, the mill manager at Georgia-Pacific Brewton LLC's paper mill in Brewton has provided evidence by declaration that he made the decision to terminate Rabb[23] based upon plaintiff's admissions that he falsified BOD test documents and lied to his supervisor about when he ran the tests. (Doc. 26, Exhibit C, Declaration of Jeff Joyce, at ¶ 8; *see also id*. at ¶ 9 ("GP takes allegations of falsification and dishonesty very seriously. I am not aware of any GP employee who has been retained after allegations were substantiated that the employee falsified test documentation and lied during a company investigation.")) In addition, the fact that Rabb "attempted to minimize the

---

[22]      Flores was disciplined by Georgia-Pacific for discussing with Rabb his EEOC charges. (Doc. 26, Exhibit E, Declaration of Roberto Flores, at ¶ 7) Flores says he approached Rabb upon learning of his EEOC claims because he was "surprised and confused[]" and wanted to know why plaintiff had made allegations against him. (*Id*.) "I now understand that it was inappropriate of me to discuss that subject. I made no other comments to Mr. Rabb regarding his EEOC complaints." (*Id*.)

[23]      Neither Jack Kirkland nor Roberto Flores played any role in the decision to terminate Rabb. (Doc. 26, Joyce declar., at ¶ 10; *see also* Wade declar., at ¶ 14; Kirkland declar., at ¶ 13;

importance of his falsification by suggesting that the tests in question were mere 'mill tests,'" also factored into the termination decision. (*Id.* at ¶ 8) Prior to making the decision to terminate Rabb, Joyce discussed the allegations against Rabb with Mike Wade and Dan Rowland, both of whom reported to Joyce numerous findings based upon their investigation of the incident, as follows:

a.  On Saturday, July 26, 2008, Sunday, July 27, 2008 and Monday, July 28, 2008, Mr. Rabb was working the day shift and was responsible for testing the BOD samples in the incubator that had been collected the prior Monday, Tuesday and Wednesday.

b.  A college co-op working in the lab over the weekend noticed that the final BOD tests were not recorded on Saturday or Sunday. When he asked Mr. Rabb about the tests, Mr. Rabb said he had run them but had not yet recorded the numbers. However, the samples remained in the incubator. On Monday, the co-ops noticed by that morning that all three days' test results were recorded as if they had been run on the correct days.

c.  On August 1, 2008, Dan Rowland, Mr. Rabb's supervisor, confronted Mr. Rabb about the BOD tests in question. At that time, Mr. Rabb told Mr. Rowland that he had not run the test as required on Saturday, but that he had run both Saturday's test and Sunday's test on Sunday.

---

Flores declar., at ¶ 8)

d.       When Mr. Rowland met again with Mr. Rabb on August 6,[24] Mr. Rabb admitted to Mr. Rowland he had lied to him during the first investigation. This time, Mr. Rabb reported that he had not run the tests for Saturday or Sunday until Monday morning.

e.       Based on other witness statements, it was unclear whether Mr. Rabb was telling the truth about running all the tests on Monday. One of his co-workers reported seeing Mr. Rabb's results fully recorded by 8:00 a.m. on Monday, which would not have provided enough time to run all three tests.

f.       During the investigation, Mr. Rabb stressed that the tests in question were only "Mill" tests, rather than tests that would be reported to an environmental agency.

(Doc. 26, Joyce declar., at ¶ 7 (footnote added); *see also* Doc. 26, Wade declar., at ¶ 12

(same)) Rabb admits that he did not test the samples until Monday morning and that he

did not tell any members of management this fact because he did not trust any of them.

(Doc. 26, Rabb depo., at 242)[25]

Q       So then you say, so on August 1st, 2008, I was called into a meeting with members of management about these issues. In this meeting were Dan Rowland and Wesley Skipper. I told them a different story because I was looking to see if the environmental management still had

---

[24]     Rabb met not only with Rowland but also with Wesley Skipper, Mike Wade, and Daren Sims. (Doc. 29, Exhibit G, Rabb depo., at 257) Ronnie Duncan, Rabb's union rep, was also present at the meeting. (*Id.*)

[25]     Although Rabb claims that he was told by Donald Carver that, on another occasion, Joey Pitts forgot to run the same tests he forgot to run (*id.* at 245, 247-248) yet was not discharged (*id.* at 313), GP's investigation of this allegation found no evidence to support it (Doc. 26, Wade declar., at ¶ 12.g. ("We investigated this allegation. When questioned, both Joey Pitts and Donald Carver denied Mr. Rabb's allegation."); *see* Doc. 26, Rabb depo., at 247 (the union rep told plaintiff that Carver recanted his story about Joey)).

Rusty Cunningham, who would have been the 3:00 to 11:00 shift tech, still
checking behind me and reporting it to Jack and Roberto and covering it up.

A    Yes.

Q    So when Dan asked you about running these samples, you
didn't't tell him the truth?

A    I didn't't tell him the truth at first. Because, the reason being, I
asked him three times what was going on, and he never did give me a
response. So I said, okay. So I changed up just to see if – like I say, if Rusty
was looking behind me like he did with the CODs. And I knew he wasn't
going to tell me, but he'll tell the union rep if that is what happened.

(*Id*. at 249-250)

8.    On August 19, 2008, Rabb was informed by an intra-company memo

penned by Dan Rowland, plaintiff's supervisor, that he was being terminated. (Doc. 26,

Wade declar., at ¶ 13)

On Friday, August 1, 2008, we met to investigate B.O.D. test procedures
you were scheduled to perform over the three day period from Saturday,
July 26th, thru Monday, July 28th, 2008. At that time you informed me that
you had not performed a test on Saturday, 7/26, but conducted both tests on
Sunday, 7/27, and subsequently recorded these test results as though both
were performed on the correct day. Additionally, Wesley Skipper reports
that when he called you on Tuesday, 8/5, to schedule a follow-up interview
to investigate this issue further, you stated that you had told us on Friday,
8/1, everything you knew about the B.O.D. testing you were scheduled to
have performed and had nothing further to add.

However, on Wednesday, 8/6, you confirmed that you had lied to me during
our meeting on Friday, 8/1, and you had not run the scheduled B.O.D. tests
on either Saturday or Sunday. Instead, your statement on 8/6 was that you
ran all three B.O.D. tests on Monday morning, 7/28, after completing your
Mill rounds, and recorded those results by 10:00 a.m. Further, you

13

trivialized your job performance responsibilities by stating that these were "just" Mill tests that you failed to complete as assigned.

According to other witness statements, B.O.D. results for all three scheduled test dates were recorded on the Water Report by 8:00 a.m. on Monday morning, 7/28, in direct conflict with your statement that you completed the testing and recorded the data by approximately 10:00 a.m. As you stated when questioned about this conflicting information during a call on Wednesday afternoon, 8/6, there was not enough time for you to have completed your Mill rounds, eaten your breakfast, performed B.O.D. testing on all three samples and recorded results by 8:00 a.m. However, you have maintained that you performed all three tests and recorded the data by 10:00 a.m. This conflicting information and your admission that you were not truthful with respect to other matters during this investigation cause us to question your statement that you conducted the required B.O.D. tests at all.[26]

Based on the results of our investigation[,] including the information referenced above, your actions of failing to perform your job duties, knowingly recording falsified test data and lying during an investigation is (sic) found to be in violation of the Company's Code of Conduct and contractual agreement between the Company and the United Steelworkers. Therefore, your employment with GP-Brewton LLC is being terminated effective Tuesday, August 19, 2008.

(Doc. 26, Exhibit C to Wade declar. (footnote added)) While Rabb agreed during his

deposition that many of the statements in this termination memo were correct (*see* Doc.

---

[26]  "Right. And my point is that, once again, they are not looking at the facts that's before them – that was before them, where you have their own supervisor standing right here, no more than from here to the court reporter, when I'm running the test. Which it's stated by Mike Wade that she said that she couldn't tell which day I was running them from, but she knew . . . she was there when I was running them. And that was around 8:00 when I was running them. You're not going to get this here data unless you run your tests. In other words . . ., they said I just wrote the numbers up, but that's showing you that that is not right. They are saying that I was dishonest. But like I said earlier, it was know[n] about management, that management was dishonest, too, in this . . . investigation. And nobody looked at management being dishonest, they just looked at

26, Rabb depo., at 270-275), he rejected the statement in the memo referencing Skipper (*id*. at 271) and indicated that the referenced information about other witness statements simply supported his conspiracy theory (*id*. at 274).

A    They were saying . . . what witnesses said. But that's what I'm talking about right there.

Q    Okay. That's what your talking about management lying?

A    That's what I'm talking about.

.    .    .

Q    Dan Rowland and Wesley Skipper ch[]ose to ignore these findings and brand me a liar. This is a clear[-]cut [case] of discrimination towards me as a black American, because they chose to ignore what the facts shows and still called me a liar.

Now, you agree that you lied to them during their investigation; correct?

A    Yeah, I agreed. I admit I changed my story up just to see what kind of information they would – and I told them that prior to the meeting. I mean, in the meeting, the very first meeting, I told them that and I told them why I did it. And I also told them that the reason I didn't tell management about it [was] because all . . . this what I had been through, I don't trust management.

. . . [M]e not trusting management never concerned them and they never tried to reconcile that to make sure that management can be trustworthy.

.    .    .

Q    Other than the fact you were the only black American in the
_____
me." (Doc. 29, Exhibit G, Rabb depo., at 276)

lab . . . do you have any other facts that support your termination being at all racially motivated?

      A      Other than that. That's the only fact for the termination.

.     .     .

      Q      Other than the fact you had [filed previous EEOC charges] . . ., do you have any other fact to support your claim that you were terminated in retaliation for filing EEOC charges?

      A.      No, . . . not if I'm understanding the question correctly, I don't.

(*Id.* at 279, 279-280 & 281; *see* Doc. 29, Exhibit G, Rabb depo. at 284-287(plaintiff's testimony that his sister told him that she had been informed by an unidentified Georgia-Pacific employee that he was terminated in retaliation for being a witness in an upcoming lawsuit filed against Smurfit[27])[28]  Following his termination, the union, Local

---

[27]     While Rabb also testified that his sister told him he was terminated in retaliation for filing the EEOC charges (*see id.*, at 284 & 287), his revelations regarding the specifics of what his sister told him relate solely to his agreement to testify for a former Smurfit employee in her lawsuit against Smurfit-Stone (*see id.* at 285-287) and have no link to the EEOC charges he filed against Georgia-Pacific (*see id.*).

[28]     Rabb testified that Jack Kirkland falsified environmental test data while working for GP. (Doc. 26, Rabb depo., at 295-300) Plaintiff indicated that Kirkland changed the volume to add amounts when he was running the compliance point samples. (*See id.* at 296-297)

     [W]hen I ran . . . these samples, all my BODs bottom[ed] out. . . . [W]hich was no good . . . for all three days. And so I put a call in to the duty environmental, which (sic) was Steve Vines at that time, then they called Roberto, then they called Jack. And what I ended up doing, I ended up saving my sample and Jack changed these volume numbers over here.

(*Id.* at 296) Rabb told no one about what Kirkland did (*id.* at 297); he did not call the ethics

941, filed a grievance on Rabb's behalf. (Doc. 29, Exhibit G, Rabb depo., at 290)[29]

Needless to say, Rabb did not get his job back. (*Id*.)

9.    After Rabb was terminated, he was informed that the Mobile Register ran a story about the failure of mill officials to report noncombustible gases to the State of Alabama yet no one was terminated as a result of this incident. (Doc. 29, Exhibit G, Rabb depo., at 264) According to Rabb, the individuals who made this mistake were none other than Jack Kirkland and Roberto Flores because they were the individuals responsible for making such reports to the State. (*See id*.) Because plaintiff was no longer working for the company, he does not know if anyone, including Flores and Kirkland, were disciplined because of the failure to report. (*See id*. at 265)

10.    Rabb filed suit against the defendants in this Court on July 14, 2009. (Doc. 1) His complaint, as amended on November 2, 2009, reads, in relevant part, as follows:

> The Plaintiff and his co-workers [at Smurfit] had filed numerous grievances regarding this conduct internally, had filed charges with the EEOC, and had, in fact, filed suit in Federal District Court alleging numerous things, including discriminatory practices, at the time that

hotline (*id*. at 300).

    In addition, plaintiff testified that while he was working at the mill, "two white guys got caught while still on the clock and off company property in a company truck stealing a deer stand and they only got ten days off. And everybody knows that stealing is a violation of the company's code of conduct. But . . . no one got terminated in that issue." (Doc. 29, Exhibit G, Rabb depo., at 265-266; *see also id*. at 267)

[29]    It was the union's position that Rabb's punishment was extreme given the length of his employment at the Brewton Mill, both when it was owned by Smurfit and after being taken over by Georgia-Pacific. (*See* Doc. 29, Exhibit J)

Smurfit-Stone sold to Georgia Pacific. The Defendants knew, therefore, that they could not terminate the Plaintiff at that time without being subject to liability. The Plaintiff, however, had been labeled a "trouble maker," and this opinion of the Plaintiff was widely held by the management of Georgia Pacific when they bought the plant.

4. Subsequent to the sale of the plant, on August 19, 2008, the Plaintiff was terminated because of alleged misconduct for which other employees, non-minority, were not terminated.

.     .     .

## COUNT ONE-RACIAL DISCRIMINATION (TITLE VII)

8. The Plaintiff incorporates by reference and realleges as if fully set out herein all previous allegations.

9. The Plaintiff belongs to a racial minority, and was qualified for the job for which the Defendants employed him.

10. The Defendants subjected the Plaintiff to an adverse job action.

11. The Defendants treated similarly situated employees outside of the Plaintiff's racial class more favorably.

WHEREFORE, plaintiff is entitled to damages, including net lost wages and benefits to the date of trial (including interest); compensation for mental and emotional humiliation or pain and anguish; punitive damages since a higher management official or defendant personally acted with malice or reckless indifference to Plaintiff's protected rights, and the Defendants did not act in a good faith attempt to comply with the law by adopting policies and procedures to prohibit such workplace discrimination;[30] attorney's fees and costs; and any other relief the Court

---

[30] Rabb was aware that Georgia-Pacific had a code of conduct (Doc. 26, Exhibit B, Rabb depo., at 315), same providing, in relevant part, as follows:

. . . Our continued success requires that we utilize every employee's skills and

18

knowledge, without discrimination or harassment based on color, race, religion, gender, sexual orientation . . . or any other basis prohibited by applicable law.

.     .     .

Nondiscrimination

GP's goal is to place the right people with the right virtues and talents in the right jobs. In striving to reach this goal, as well as in all other aspects of employment, GP provides equal opportunity to all persons without unlawful discrimination.

*Unlawful discrimination will not be tolerated.*

If you feel you have been discriminated against, have observed unlawful discrimination, or if someone confides to you that he or she has been discriminated against, *you must contact one of the following*: your immediate supervisor, the manager of the facility, the local Human Resources leader, the Corporate Human Resources Department, the Law Department, the Compliance and Ethics Department, or the GuideLine. Retaliation against anyone for reporting unlawful discrimination in good faith is against Company policy and prohibited by law.

Prohibition of Discriminatory Harassment in the Workplace

We forbid any verbal or other conduct that is offensive, intimidating or disparaging to any individual or group on account of color, race, religion, gender, sexual orientation . . . or other basis prohibited by applicable law, or that contributes to an intimidating, hostile or offensive working environment on such account. All forms of such conduct are prohibited, including but not limited to:

● Verbal conduct such as epithets, derogatory and/or sexual jokes or comments, teasing, name calling, slurs, or unwarranted sexual advances, invitations, or comments;

● Visual displays such as derogatory and/or sexually-oriented posters, photography, pictures, pornographic displays, cartoons, drawings, or gestures;

● Physical conduct including assault, unwanted touching, gestures intentionally blocking normal movement or interfering with work because of sex, race, or any other unlawful basis;

- Threats and demands to submit to sexual requests as a condition of continued employment or to avoid some other loss, and offers of employment benefits in return for sexual favors; and

- Retaliation for reporting or threatening to report harassing conduct.

The use of electronic media, including telephone, fax, e-mail, instant messages or the internet for such purposes will not be tolerated.

GP's policy against harassing conduct applies to all persons involved in the operation of the Company and prohibits such behavior by any employee – whether a supervisor or a coworker – and any other representative of the Company. Our policy prohibits all such behavior, whether directed to employees, applicants for employment, or other people who we do business with, such as outside vendors, contractors, or customers.

*Discriminatory harassment in any form will not be tolerated.*

If you feel you have been subjected to harassing behavior or if you observe such conduct or if someone confides to you that he or she has been subjected to it, *you must contact one of the following*: your immediate supervisor, the manager of the facility, the local Human Resources leader, the Corporate Human Resources Department, the Law Department, the Compliance and Ethics Department, or the GuideLine. Retaliation against anyone for reporting discriminatory harassment in good faith is against Company policy and prohibited by law.

Expectations of Employees

Every employee is required to follow our policy against unlawful discrimination and discriminatory harassment and to bring to the Company's attention any action that does not comply with that policy or our commitment to equal employment opportunity. Supervisors and managers must be watchful for any signs that our policy is not being followed and must see that any possible violations are immediately referred for investigation, whether or not there has been a complaint. The Company will investigate and respond to all reports of unlawful discrimination or discriminatory harassment.

(Doc. 26, Exhibit B, Code of Conduct) Rabb maintained during his deposition that even though the policy provided a number of people he could have complained to about

deems just and proper.

## COUNT TWO-HOSTILE WORK ENVIRONMENT (TITLE VII)

12.     The Plaintiff incorporates by reference and realleges as if fully set out herein all previous allegations.

13.     The Plaintiff was subjected to a hostile and/or abusive work environment because of Plaintiff's race.

14.     A supervisor and/or supervisors with immediate or successively higher authority over the Plaintiff created this environment and/or permitted its existence.

15.     Plaintiff suffered damages as a proximate or legal result of such hostile or abusive work environment.

WHEREFORE, plaintiff is entitled to damages, including net lost wages and benefits to the date of trial (including interest); compensation for mental and emotional humiliation or pain and anguish; punitive damages since a higher management official or defendant personally acted with malice or reckless indifference to Plaintiff's protected rights, and the Defendants did not act in a good faith attempt to comply with the law by adopting policies and procedures to prohibit such workplace discrimination; attorney's fees and costs; and any other relief the Court deems just and proper.

## COUNT THREE-RETALIATION

16.     The Plaintiff incorporates by reference and realleges as if fully set out herein all previous allegations.

17.     The Plaintiff and a group of his co-employees engaged in a

---

Flores' conduct, when he reported his concerns to Mike Wade his "version" or "points" were ignored. (Doc. 29, Exhibit G, Rabb depo., at 316-317)

statutorily-protected activity which included objecting to what they felt were discriminatory practices of promotion, unequal application of company policy, hostile work environment issues, and harassment. They filed, as well, charges with the EEOC based on these perceived violations of law.

18.     The Plaintiff suffered an adverse employment action.

19.     Such action was causally related to Plaintiff's statutorily-protected activities.

20.     As a proximate result thereof, the Plaintiff has been damaged.

WHEREFORE, plaintiff is entitled to damages, including net lost wages and benefits to the date of trial (including interest); compensation for mental and emotional humiliation or pain and anguish; punitive damages since a higher management official or defendant personally acted with malice or reckless indifference to Plaintiff's protected rights, and the Defendants did not act in a good faith attempt to comply with the law by adopting policies and procedures to prohibit such workplace discrimination; attorney's fees and costs; and any other relief the Court deems just and proper.

## COUNT FOUR-NEGLIGENT SUPERVISION

21.     The Plaintiff incorporates by reference and realleges as if fully set out herein all previous allegations.

22.     At all times relevant hereto, the Defendants were under a duty to supervise the actions of their agents, servants and employees who were in a supervisory position over the Plaintiff, having previously been put on notice of harassing conduct, but failed to correct said conduct.

23.     As a proximate result thereof, the Plaintiff has been damaged.

WHEREFORE, for the above reasons, the Plaintiff demands judgment against the Defendant[s] for compensatory damages, to include damages for mental anguish, plus costs.

(Doc. 22, at 2 & 2-5) Plaintiff testified during his deposition regarding information he believes supports the allegation in his complaint, as amended, that Georgia-Pacific management regarded him as a troublemaker when they purchased the Brewton mill. (*See* Doc. 29, Exhibit G, Rabb depo., at 363-364)

> A    When they terminated everybody from that mill and [] hired back, another co-worker, who was Barbara Rostchild, at that time had told me that they was going to hire . . . the salary . . . personnel, and she told me that somebody from the mill, she never did tell me who it was, told [her] that they would start hiring hourly personnel, but Rabb, that troublemaker, he can forget it.

> Q    And Barbara Rostchild told you this?

> A    Yes, ma'am.

> Q    And who told her that?

> A    She did not give me no answer. She . . . would not indulge (sic) [on that].

> Q    Other than the statement that someone, we don't know who, said to Barbara Rostchild about you being a troublemaker . . . is there any other thing that makes you think that you were labeled a troublemaker in the opinion of management of Georgia-Pacific before they hired you?

> A    The incident with that hangman's noose, for one. I mean . . . that's when that was brought out, after the incident with the hangman's noose.

> Q    Because you were on television?

> A    Yes.

> Q    Now, I think you testified earlier that you don't know who made the

decision to hire you for Georgia-Pacific; is that right?

A      Yeah. . . . All I know is somebody called me. I still don't know who called me.

Q      You don't even know who you interviewed with; is that right?

A      . . . I can't remember the names who I interviewed with, who called me to give me this letter, to sign this letter. I don't know none of their names or nothing.

.      .      .

Q      But my question was: Do you know if any of the people who made the decision to hire you even knew about it [i.e., the hangman's noose]?

A      I don't know what they knew about it, if that's what you're asking.

(*Id.* at 363-365)

## CONCLUSIONS OF LAW

### A.      Motion to Strike Exhibits.

1.      The defendants have moved to strike certain exhibits attached by plaintiff to his response in opposition, namely the entirety of Exhibits A, B, C, D, E, I, and J and portions of Exhibits F and H. (*See* Doc. 30; *compare id. with* Doc. 29, Attached Exhibits) Exhibit A purports to be a compilation of various grievance reports made by Rabb while employed with Smurfit, disposition of those grievances, internal memoranda, and the like; Exhibit B purports to be Rabb's first charge of discrimination filed with the EEOC in August of 2006 when he was employed by Smurfit; Exhibit C purports to be Rabb's

amendment to his original charge of discrimination with attached documentation in support thereof; Exhibit D apparently purports to be a picture but same did not scan to provide a viewable image;  Exhibit E purports to be an August 5, 2007 police report about a rope found hanging inside the mill when it was owned by Smurfit; Exhibit F is the affidavit of Ed Hwoington; Exhibit H is Rabb's March 5, 2008 charge of discrimination with attachments; Exhibit I purports to be a copy of the August 19, 2008 intracompany memo terminating Rabb's employment with Georgia-Pacific; and Exhibit J purports to be a copy of a August 28, 2008 grievance report filed on Rabb's behalf by the union president objecting to plaintiff's termination. The defendants seek to strike these exhibits primarily on the basis that same were not authenticated but they also argue that Exhibits A through E should be stricken because they are irrelevant to this cause of action in that they relate solely to Rabb's employment with Smurfit. (*See* Doc. 30, at 2)

    2.    "To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed.R.Civ.P. 56(e). Documents which do not meet those requirements cannot be considered." *Shanklin v. Fitzgerald*, 397 F.2d 596, 602 (8th Cir.) (internal quotation marks omitted; citations omitted), *cert. denied sub nom. Shanklin v. Pattonville R-111 School Dist. Bd. of Educ.,* 546 U.S.. 1066, 126 S.Ct. 807, 163 L.Ed.2d 636 (2005); *see*

*First Nat'l Life Ins. Co. v. California Pacific Life Ins. Co.*, 876 F.2d 877, 881 (11th Cir. 1989) ("The photocopies of the Coffman complaint and CPIS cross-claim that FNL submitted did not bear the imprint of the New Mexico court's seal nor were they supported by an affidavit of an officer having legal custody of the originals attesting to their authenticity. They were therefore not properly authenticated under Fed.R.Civ.P. 44(a)(1) or Fed.R.Evid. 902(1) or (2)."); *Ripps v. Powers,* 2008 WL 5428195, *2 (S.D. Ala. 2008) ("For a document to be considered in support of or in opposition to a motion for summary judgment, it must be authenticated by an affidavit that meets the requirements of the summary judgment Rule 56(e)."), *judgment aff'd in part and rev'd in part,* 356 Fed.Appx. 352 (11th Cir. 2009); *Lugue v. Hercules, Inc.,* 12 F.Supp.2d 1351, 1355-1356 (S.D. Ga. 1997) ("Documents which are not properly authenticated and verified do not meet the requirements of Rule 56(e) and should not be considered when evaluating a motion for summary judgment."). Exhibits A through E attached to plaintiff's brief in opposition to defendants' motion for summary judgment have been submitted to this Court unattached to an affidavit or deposition and, therefore, they are unauthenticated. Accordingly, these exhibits are **STRICKEN** [31] and have not been considered by the undersigned in ruling on the defendants' motion for summary

---

[31] Because Exhibit H consists, in part, of another copy of the police report at Exhibit E, it too is **STRICKEN**. In addition, the "Hydrochloric Acid" page of Exhibit H and the February 26, 2008 email penned by Roberto Flores are **STRICKEN** because they have not been properly authenticated.

judgment.[32] However, the Court declines to strike Exhibits I and J. Exhibit I, the August 19, 2008 intracompany memo detailing the reasons for Rabb's termination, was attached as an exhibit to Mike Wade's declaration filed in support of the defendants' motion for summary judgment (*see* Doc. 26, Exhibit C) and, therefore, it would amount to mere form over substance for the Court to strike this copy of the memo simply because it has some indiscernible written marks (and perhaps remarks) on it. Moreover, Exhibit J is not stricken because Rabb discussed during his deposition the fact that the union had filed a grievance on his behalf challenging his termination and that is the only significance of this document.[33]

3.      Finally, the defendants seek to strike certain statements in the affidavit of Ed Howington, a former Smurfit employee who never worked for Georgia-Pacific. (*See* Doc. 30, at 2; Doc. 31, at 8) Rule 56(e) of the Federal Rules of Civil Procedure makes

---

[32]      These five exhibits also are due to be **STRICKEN** because they are irrelevant to this cause of action inasmuch as they relate solely to Rabb's reports of racial discrimination while he was employed by Smurfit. *Cf. Jackson v. Sara Lee Bakery Group*, 677 F.Supp.2d 1268, 1276 (N.D. Ala. 2009) ("It is undisputed that Daudelin was not a decision-maker regarding the elimination of Jackson's ZBM position during the conversion process. Therefore, any comments made by Daudelin to Givens are immaterial and irrelevant."). Portions of Ed Howington's affidavit are also **STRICKEN** because they relate solely to Rabb's claims of racial discrimination while employed by Smurfit and are, therefore, irrelevant. Those portions stricken as irrelevant are paragraphs 1 and 4 and the last two sentences of paragraph 2.

[33]      The union makes no reference to plaintiff's termination being discriminatory or retaliatory; therefore, consideration of same will have no impact on this Court's analysis of the summary judgment motion.

clear that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Therefore, "[a] court may strike portions of an affidavit that are not based upon the affiant's personal knowledge or make generalized and conclusory statements." *Davis v. Valley Hospitality Services, LLC,* 372 F.Supp.2d 641, 653 (M.D. Ga. 2005), *aff'd in part*, 214 Fed.Appx. 877 (11th Cir. Nov. 13, 2006), *rev'd in part*, 211 Fed.Appx. 841 (11th Cir. Nov. 30, 2006), *cert. denied*, 549 U.S. 1341, 127 S.Ct. 2048, 167 L.Ed.2d 768 (2007); *see also Hegre, supra,* 508 F.Supp.2d at 1325 ("'Evidence inadmissible at trial cannot be used to avoid summary judgment.' Likewise, '[e]ven on summary judgment, a court is not obligated to take as true testimony that is not based upon personal knowledge.'" (internal citations omitted)); *cf. Nicolatos v. Sprint/United Management Co.,* 2006 WL 3003955, *2 (N.D. Ga. Oct. 19, 2006) ("An affidavit submitted in opposition to a motion for summary judgment must affirmatively show that the statements made in the affidavit are those of the affiant."), *order vacated in part on reconsideration,* 2006 WL 3490817 (N.D. Ga. Nov. 28, 2006). Moreover, just as "common sense dictates that if an affiant is an employee of a company, []he has personal knowledge of events and circumstances that occurred at the company within [his] sphere of observation[,]" *Davis, supra*, 372 F.Supp.2d at 653, so too common sense dictates that an affiant not employed by a company would have no personal knowledge of events or

circumstances occurring at the company.   Because Howington's statements in paragraph 3 and his statements in paragraph 2 from sentence two through sentence five are not based upon his personal knowledge but, instead, are clearly based on information received from other sources, they are **STRICKEN** and will not be considered by the undersigned in ruling on the defendants' motion for summary judgment.

**B.**     __Summary Judgment Standard__.

4.     Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."   Fed.R.Civ.P. 56(c)(2); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if '*some* alleged factual dispute' between the parties remains, so long as there is 'no *genuine* issue of *material* fact.'").

5.     The party seeking summary judgment has the initial responsibility of informing the court of the basis for the motion and of establishing, based upon the discovery instruments outlined in Rule 56(c), that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.   *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also*

*Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1313 (11th Cir. 2007)

("The moving party bears the initial burden of showing the court, by reference to

materials on file, that there are no genuine issues of material fact that should be decided at

trial."). Once this initial demonstration is made, Rule 56(e) requires the nonmoving party

to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers

to interrogatories, and admissions on file,' designate 'specific facts showing that there is a

genuine issue for trial.'" *Celotex Corp., supra*, 477 U.S. at 324, 106 S.Ct. at 2553,

quoting Fed.R.Civ.P. 56(e); *see also Allen*, supra, at 1314 ("'When a moving party has

discharged its burden, the non-moving party must then "go beyond the pleadings," and

show by its own affidavits, or by "depositions, answers to interrogatories, and admissions

on file," designate specific facts showing that there is a genuine issue for trial.'"); *see*

*Comer v. City of Palm Bay, Florida*, 265 F.3d 1186, 1192 (11th Cir. 2001) ("Once the

moving party discharges its initial burden of showing that there is an absence of evidence

to support the non-moving party's case, the non-moving party must specify facts proving

the existence of a genuine issue of material fact for trial confirmed by affidavits,

'"depositions, answers to interrogatories, and admissions on file."'").

> Forbidding reliance upon pleadings precludes a party from "choos[ing] to wait until trial to develop claims or defenses relevant to the summary judgment motion." . . . This effectuates the purpose of summary judgment which "'is to pierce the pleadings and to assess the proof in order

30

to see whether there is a genuine need for trial.'" . . . Thus, "mere general allegations which do not reveal detailed and precise facts" will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists.

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir.), *cert. denied sub nom. Jones v. Resolution Trust Corp.*, 516 U.S. 817, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995); *see also LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) ("[The nonmoving party] must raise 'significant probative evidence' that would be sufficient for a jury to find for that party."). In other words, there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Comer, supra*, 265 F.3d at 1192 ("Summary judgment is required where the non-moving party's response to a motion is merely 'a repetition of his conclusional allegations' and is unsupported by evidence showing an issue for trial.").

6. In considering whether the defendants are entitled to summary judgment, the Court has viewed the facts in the light most favorable to plaintiff Willie Rabb. *Comer, supra*, 265 F.3d at 1192 ("We view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

The requirement to view the facts in the nonmoving party's favor

extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to the material facts." A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

*Garczynski, supra*, 573 F.3d at 1165 (internal citations omitted).

**C.** **Abandonment of Claim(s)**.

7.    Plaintiff has specifically abandoned his hostile work environment claim, that is, Count Two of his complaint, as amended. *See, e.g., Walton ex rel R.W. v. Montgomery County Bd. of Educ.,* 371 F.Supp.2d 1318, 1324 (M.D. Ala. 2005) (finding abandonment of claim). Therefore, the Court hereby **GRANTS** the defendants' motion for summary judgment on Rabb's hostile work environment claim.

8.    While, as pointed out by the defendants, plaintiff did not specifically argue his racial discrimination claim, focusing instead on his retaliation and negligent supervision claims (*see* Doc. 29, at 6-8), since he does not explicitly abandon that claim and appears to intertwine that claim with his retaliation and negligent supervision claims, the Court will give some consideration to Count One of the complaint, as amended.

**D.** **Racial Discrimination (Count One)**.

9.    Rabb claims that his termination on August 19, 2008, was the result of unlawful race discrimination in violation of Title VII.   In a Title VII disparate treatment case, a plaintiff must prove intentional discrimination. *See Armindo v. Padlocker, Inc.,*

209 F.3d 1319, 1320-1322 (11th Cir. 2000); *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266

& 1267 (11th Cir. 1999).   A plaintiff "may use three different kinds of evidence of

discriminatory intent: direct evidence, circumstantial evidence or statistical evidence."

*Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).   The plaintiff in

this case seeks to show discrimination using circumstantial evidence.   (*See* Doc. 22, ¶ 11

("The Defendants treated similarly situated employees outside of the Plaintiff's racial

class more favorably."))

> When a plaintiff attempts to prove intentional discrimination in
> violation of Title VII using circumstantial evidence, we apply the now
> familiar shifting burden framework established by the Supreme Court in
> *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36
> L.Ed.2d 668 (1973), and T*exas Dep't of Community Affairs v. Burdine*, 450
> U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).   Under this framework,
> the plaintiff has the initial burden of establishing a prima facie case of
> discrimination. If he meets that burden, then an inference arises that the
> challenged action was motivated by a discriminatory intent. The burden
> then shifts to the employer to "articulate" a legitimate, non-discriminatory
> reason for its action. If the employer successfully articulates such a reason,
> then the burden shifts back to the plaintiff to show that the proffered reason
> is really pretext for unlawful discrimination.

*Schoenfeld, supra*, 168 F.3d at 1267 (internal citations omitted); *see also Burke-Fowler v.*

*Orange County, Florida*, 447 F.3d 1319, 1323 (11th Cir. 2006) ("If the plaintiff satisfies

[the *prima facie*] elements, then the defendant must show a legitimate, non-discriminatory

reason for its employment action. If it does so, then the plaintiff must prove that the

reason provided by the defendant is a pretext for unlawful discrimination." (internal

citations omitted)).

10.     In order to make out a *prima facie* case of disparate treatment in a race discrimination case, plaintiff must show: "(1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted); *see also Burke-Fowler, supra* ("To establish a prima facie case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job.").

11.     The defendants admit that plaintiff has established the first two elements of his *prima facie* case but argue that the final two elements are missing. (*See* Doc. 26, at 13-17) Because this Court is in agreement with the defendants that plaintiff has not come forward with evidence establishing that the defendants treated similarly situated employees outside of his protected class more favorably than he was treated, it need not consider the defendants' argument that Rabb was not qualified to do his job.

> When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. When making that determination, [w]e require that the

34

quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges.

*Burke-Fowler, supra,* 447 F.3d at 1323 (internal quotation marks and citations omitted); *see also Holifield, supra,* 115 F.3d at 1562 ("To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. *If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.*" (internal citations omitted; emphasis in original)).

12.    In is clear in this case that Rabb was terminated from his employment with Georgia-Pacific not only because he failed to perform his job duties by failing to conduct BOD tests on the days they were scheduled to be conducted but, more importantly, because he initially lied to his supervisor about when he conducted the tests and then arguably falsified documents and data to either reflect that the tests had been performed when they were not performed at all or to reflect that the tests were performed earlier than would have been possible under the circumstances. Rabb attempts to compare himself to

several people: (1) Joey Pitts, who (he heard from a third party) allegedly failed to run a BOD test; (2) Jack Kirkland, who Rabb testified altered BOD test results; (3) two white males who allegedly stole a deer stand from nearby property during work hours yet were only suspended for ten (10) days for their conduct; and (4) Roberto Flores, who not only was merely disciplined for questioning Rabb about his EEOC charges but was not terminated after committing acts which led to the Brewton mill being fined. There is nothing about the conduct of the two "deer stand" employees that is comparable to Rabb's conduct and, therefore, they are not apt comparators. Moreover, none of the other employees, including the "deer stand" employees, are apt comparators to Rabb because plaintiff has produced no evidence whatsoever that any of these other employees, to which he compares himself, lied to anyone about their alleged misconduct/failure to perform job duties. *See Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999) ("Deputies Bodree, Odell, and Lane each may have carried unauthorized passengers on one occasion, but there is no evidence they lied about it as Appellant did."). In other words, the quality of Rabb's misconduct is not the same as that of the individuals to which he attempts to compare himself. Because Rabb has failed to meet his burden of pointing to a non-minority employee who engaged in the same or similar misconduct and, as well, has presented no other circumstantial evidence suggesting racial discrimination,[34]

---

[34]     Rabb's opinion that he was discriminated against, without more, is not sufficient to establish a *prima facie* case nor is any alleged bias by held Flores or Wade because neither of

he cannot establish a *prima facie* case of racial discrimination and the defendants are entitled to summary judgment in their favor on Count One of the complaint, as amended.

**E.    Retaliation (Count Three)**.

13.    Rabb also claims that he was terminated on August 19, 2008, in retaliation for numerous internal complaints at Georgia-Pacific and charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). "To establish a prima facie case of retaliation, the plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *Holifield, supra,* 115 F.3d at 1566 (citations omitted); *see also Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir. 2007) ("To establish a prima facie case of retaliation under Title VII, 'the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events.'"). Because it is clear in this case both that Rabb engaged in statutorily protected expression and that he suffered an adverse employment action, *see Holifield, supra,* 115 F.3d at 1566 ("Here, it is clear that Holifield engaged in statutorily protected expression. Holifield filed EEO[C] complaints and voiced his concerns about racial discrimination to his superiors. Both forms of expression are protected under Section 704(a). . . . It is also clear that

_____

these individuals made or influenced the termination decision. *See Holifield, supra,* 115 F.3d at 1563-1564.

Holifield suffered adverse employment action during this time; he was reassigned from CHP to staff physician, and was then terminated from his employment altogether."), this Court's sole focus becomes whether plaintiff has established a causal relationship between the two events.

> The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. But mere temporal proximity, without more, must be "very close." A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough. Thus, in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law.

*Thomas, supra*, 506 F.3d at 1364 (internal citations omitted). In this case, there is approximately a three month period of time between plaintiff's August 19, 2008 termination and the filing of his letter of revision with the EEOC on or about May 21, 2008 (that is, the protected activity in closest proximity to plaintiff's termination). The undersigned finds that this three-month period, standing alone, is not enough to establish a causal connection, *see Thomas, supra* ("That three (3) month period, without more, does not rise to the level of 'very close.'"),[35] and because plaintiff has not come forward

---

[35] This Court additionally finds that any inference of a causal connection was broken by Rabb's misconduct. *See Hankins v. AirTran Airways, Inc.,* 237 Fed.Appx. 513, 520-521 (11th Cir. 2007) ("Here, it is undisputed (indeed, Hankins herself acknowledges) that on 14 September-five days *after* Hankins allegedly reported Durham's suspected racial bias to Head-Hankins yelled at a co-worker for cutting her off in line and stated that she would 'kick his ass if he ever tried to cut in front of [her] again in line.' This intervening act of misconduct, which was plainly in violation of Rules 1 and 14 of AirTran Airways Crew Member Handbook,

with any credible other evidence tending to establish causation,[36] he has not established a prima facie case of retaliation and the defendants are entitled to summary judgment.

14. Moreover, even if this Court was to assume that Rabb has successfully established the causation prong of his retaliation claim thereby demonstrating a *prima facie* case of retaliation, it is clear that Georgia-Pacific has provided a legitimate, non-discriminatory reason for plaintiff's termination-namely, his failure to perform his job duties by not conducting BOD tests on the days they were scheduled to be performed, coupled with lying to his supervisor about when he conducted the tests and his arguable falsification of documents and data[37] to reflect either that the tests had been performed when they were not performed at all or to reflect that the tests were performed earlier than would have been possible under the circumstances. *See, e.g., Holifield, supra*, 115 F.3d at 1566 ("Once the plaintiff establishes his prima facie case, the employer must proffer a

---

severed the causal connection (if any) between Hankins' initial complaint of discrimination and AirTran's decision to terminated her employment.").

[36] Any suggestion by plaintiff that his sister told him that some unidentified person told her that he was terminated for filing charges of discrimination with the EEOC does not supply the type of other evidence of causation contemplated in this circuit both because it is hearsay but, more importantly, because it is clear from plaintiff's testimony that the hearsay comment attributable through his sister was that he was being terminated for agreeing to testify in Barbara Rostchild's case against Smurfit. Thus lacking is a causal connection between Rabb's EEOC filings against Georgia-Pacific and his termination by Georgia-Pacific.

[37] "The relevant issue here is not whether [the employee] actually falsified the entry, but rather whether [the employer] honestly *believed* [the employee] falsified the entry." *Cooper v. Southern Co.,* 390 F.3d 695, 740 (11th Cir. 2004) (emphasis in original), *cert. denied*, 546 U.S. 960, 126 S.Ct. 478, 163 L.Ed.2d 363 (2005).

legitimate, non-discriminatory reason for the adverse employment action."). "Having successfully 'rebut[ed] the presumption of retaliation by producing [a] legitimate reason[] for the adverse employment action,' the burden shifts to [Rabb] to 'demonstrate that [he] will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation.'" *Hankins v. AirTran Airways, Inc.,* 237 Fed.Appx. 513, 521 (11th Cir. 2007) (internal citations omitted). Rabb can make this showing "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id*. at 522 (citation omitted). While plaintiff does not directly address either form of pretext in his brief in opposition to the motion for summary judgment (*see* Doc. 29), the Court nonetheless considers this issue in more depth.

15.    Plaintiff certainly has not shown that a discriminatory reason more likely motivated Georgia-Pacific's termination decision inasmuch as the primary individual with the alleged racial bias, Roberto Flores, had no involvement in the decision to terminate Rabb. Standing unrefuted is the declaration statement of the Brewton mill manager, Jeff Joyce, that it was he who decided to terminate Rabb's employment with Georgia-Pacific for lying and falsifying data and, of course, there is no evidence whatsoever that Joyce

exhibited any racial bias toward plaintiff.[38] *See id*.

16.     The undersigned also finds that plaintiff has failed to establish that Georgia-Pacific's proffered explanation for his termination is unworthy of credence. While plaintiff, again, does not mention the word "pretext" in his opposition, he does contend that the evidence reflects "that other employees who engaged in conduct similar to [him] were not fired from their job[s]" and, therefore, he is entitled to have a jury consider his retaliation claim (*see* Doc. 29, at 7). *See Hankins, supra,* 237 Fed.Appx. at 522 ("Nor are we persuaded that AirTran's proffered explanations were pretextual based on Hankins' contention that other AirTran employees who engaged in similar acts of misconduct were not terminated."). However, as previously indicated, the alleged misconduct of Flores, Kirkland, and all others to whom Rabb seeks to compare himself, is particularly distinguishable from plaintiff's misconduct in terms of the quality of that misconduct inasmuch as there is absolutely no evidence that anyone other than plaintiff lied to their supervisors. *See Maniccia, supra*, 171 F.3d at 1369. Accordingly, pretext has not been established and summary judgment is appropriate on Rabb's retaliation claim. *Cooper, supra,* 390 F.3d at 725 ("'If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant

---

[38]     Even if this Court was to find that Rowland actually terminated Rabb, there is still no evidence that Rowland exhibited any racial bias toward plaintiff. In fact, it was Rowland who decided not to name plaintiff in the "near-miss" report and there is no evidence in the record that Rabb complained about Rowland or filed any charge of discrimination against him.

employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.'").

F.    **Negligent Supervision (Count Four)**.

17.    Rabb's final contention is that a question of fact exists on the issue of negligent supervision. (*See* Doc. 29, at 7) It is plaintiff's position that the employees of Georgia-Pacific who supervised, and ultimately decided to terminate, him were the same employees about whom he complained numerous times yet no steps were taken to insulate him "from the actions of these individuals, and they were allowed [by Georgia-Pacific] to continue their pattern of harassment[.]" (*Id*. at 8; *see also id*. at 7; *compare id.* at 7-8 *with* Doc. 22, ¶ 22 ("[T]he Defendants were under a duty to supervise the actions of their agents, servants and employees who were in a supervisory position over the Plaintiff, having previously been put on notice of harassing conduct, but failed to correct said conduct."))

18.    It is clear in this circuit that "[t]o support a claim of negligent supervision, the plaintiff must first demonstrate that (1) the employee committed a tort recognized under Alabama law, *Stevenson v. Precision Standard, Inc.,* 762 So.2d 820, 824 (Ala. 1999),[39] (2) the employer had actual notice of this conduct or would have gained such

---

[39]    *See also Thrasher v. Ivan Leonard Chevrolet, Inc.,* 195 F.Supp.2d 1314, 1320 (N.D. Ala. 2002) ("In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a common-law, Alabama tort.").

notice if it exercised 'due and proper diligence,' *Armstrong Bus. Servs. v. AmSouth Bank*, 817 So.2d 665, 682 (Ala. 2001), and (3) the employer failed to respond to the notice adequately." *Edwards v. Hyundai Motor Mfg. Alabama, LLC*, 603 F.Supp.2d 1336, 1357 (M.D. Ala. 2009) (footnote added). With respect to the first requirement, it is not only well settled that "Alabama does not recognize an independent cause of action for sexual harassment[,]" *Machen v. Childersburg Bancorporation, Inc.,* 761 So.2d 981, 983 n.1 (Ala. 1999); *see also Thrasher, supra,* 195 F.Supp.2d at 1320 ("Alabama does not recognize a common-law tort for sex discrimination in employment[.]"), but, as well, that Alabama does not "recognize a common-law tort for race . . . discrimination[,]" *Thomas v. Utility Trailer Mfg. Co.,* 2006 WL 2480057, *3 (M.D. Ala. 2006). Because Alabama does not recognize a common-law tort for race discrimination in employment, this Court finds that Rabb cannot maintain an action for negligent supervision "based upon conduct that is employment discrimination, but does not support a common-law tort." *Thrasher, supra*. Therefore, the defendants' motion for summary judgment as to Rabb's negligent supervision claim is **GRANTED**.

## <u>CONCLUSION</u>

Based upon the foregoing, the Court **GRANTS** the defendants' motion for summary judgment (Doc. 25) in its entirety and **DISMISSES** plaintiff's complaint (Doc.

1), as amended (Doc. 22), **WITH PREJUDICE**.

      **DONE** and **ORDERED** this the 26th day of July, 2010.

            s/WILLIAM E. CASSADY
            **UNITED STATES MAGISTRATE JUDGE**